Benjamin Shalleck, J.
This action is brought for damages for intentional falsehood. The plaintiffs claim recovery for punitive as well as actual damages, asserting that “ defendant’s wrongful acts were without legal excuse or justification
The complaint has been sustained in previous proceedings (7 A D 2d 441; 8 A D 2d 808; 9 A D 2d 620). The grievance *862 arises from the alleged failure of defendant to tell the true picture of certain agreements among them to both the Internal Revenue Department and the Federal Grand Jury. These willful acts, it is claimed, resulted in the plaintiffs’ being indicted for tax fraud criminally and being sued civilly for deficiencies and penalties. These charges have now been dismissed. The result, however, was, according to plaintiffs, serious damage, loss of business, loss of social and economic relationships, mental anguish and other injury.
Defendant by its answer, denies the above. In effect, its affirmative defenses set up its good faith and lack of malice, its supply of information at the Federal Government’s request and at no time did plaintiffs claim it to be inaccurate or incomplete. Also, the Federal Government’s proceedings against plaintiffs were independent of anything said or done by defendant. It claims that no liability can flow from these facts.
The litigation here is almost Dickensian: extensive, expensive and exhaustive. Hopefully this determination and opinion will bring finality to a controversy extant for well over a decade.
Not contemplated by the parties at the time, it had its inception in August, 1948 when plaintiff Penn-Ohio Steel Corporation could supply what defendant wanted: steel, according to defendant, “ at a time of steel scarcity”. A contract between them was consummated. As a corollary to the transaction, defendant purchased “to induce Penn-Ohio to enter into the contract”, 500,000 shares of Penn-Ohio preferred stock. At that same time, the individual plaintiffs claim, they ‘ ‘ gave up an opportunity to realize a capital gain of $500,000 from the sale of part of their common stock ”.
The acquisition by defendant of such preferred stock, as would be expected, was entered in its books as a purchase of securities.
When defendant complained of Penn-Ohio’s breach for failure to deliver the required tonnage called for by the agreement in the manner therein set out, it served a notice of termination thereof in April, 1949. Defendant claimed substantial damages: $1,230,000. Protracted negotiations toward the settlement of the parties’ differences ensued. These were conducted by Walter E. Hawkinson, then secretary and treasurer of defendant, on the latter’s behalf, and on behalf of Penn-Ohio they were conducted by plaintiff Samuel E. Magid as chairman of its board.
After what defendant characterized as “considerable good-faith bargaining- ” and by plaintiffs as having been “ conducted at arm’s length and in good faith ”, a settlement was effected. Two formal agreements evolved. One was between defendant and Penn-Ohio. This provided for defendant’s receiving pay *863 ments from the latter in the total sum of $770,000. Of this amount, $500,000 was in redemption of the preferred stock it originally purchased and $270,000 represented damages for breach of the steel supply contract. The other was between the individual plaintiffs and the defendant providing in substance for payments of $480,000 from defendant to plaintiff Magid for the purchase of Penn-Ohio stock and then stock of Tungsten Alloy Manufacturing Company, later repurchased by Magid for $10,000. (The net cost thus became $470,000.) It was claimed by plaintiffs that the latter agreement was in recognition of the loss of the capital gains sales opportunity the previous August when the steel supply contract was made.
During May, 1949 the negotiations, settlements and concurring agreements were completed. The redemption of the $500,000 of Penn-Ohio preferred stock was again recorded by defendant in its securities account. The $470,000 which was the purchase price of the Tungsten stock was charged to cost of sales; the $270,000 — the breach of the steel supply contract damages — became an income credit on defendant’s books.
It is interesting that even prior to the consummation of the “ extensive arm’s length negotiations ” (so labeled by defendant) defendant’s board authorized Hawkinson to settle with plaintiffs “ at a cost not to exceed $200,000 ” — a figure easily arrived at by subtracting from the net cost of the Tungsten stock ($470,000) the $270,000 received as damages for breach. (The purchase and redemption of the Penn-Ohio preferred shares cancelled each other out.) How was that figure precisely arrived at? Or was it mere coincidence?
The supervisor of defendant’s tax accounting department, one D. P. Hackney, who reviewed the questions relating to these transactions in connection with defendant’s 1949 income tax return, advised its vice-president and comptroller, J. A. Keogh, in January, 1950 that the loss due to the sale of the Tungsten stock was not tax deductible as a cost of sales, for it was actually a long-term capital loss which could not be offset against non-existing capital gains. After due consideration, Keogh agreed. These were by exchange of letters in January, 1950. Hawkinson later disagreed. There was dispute on the trial as to whether there ensued a discussion among the three ■ — • Hackney, Keogh and Hawkinson — resulting in a revision of the way in which the Tungsten stock loss would be treated tax-wise.
Regardless, however, the defendant stipulated that “there was never any arrangement or understanding by which, for tax *864 purposes or otherwise, the transaction was to be regarded except as reflected by the contracts executed between the parties
These settlement agreements had been prepared by defendant’s counsel. The legal effect thereof was fully known. The defendant likewise knew the opinion of its tax expert. Yet, with the knowledge of these facts, defendant’s 1949 United States income tax return reflected the loss from the sale of the Tungsten stock otherwise. It no longer, according to its report, was liable for the income of the $270,000 received as contract damages for breach of supply of steel (the first of the settlement agreements) and the $470,000 became no more than an operating expense — the cost of sales (under the second agreement). This tax treatment of the settlement by defendant was not imparted to plaintiffs.
Not until July, 1954 did any untoward development occur. Penn-Ohio’s Federal return for 1949 was then being audited. Inquiry of defendant was made as to its benefit from the settlement, reflected on Penn-Ohio’s books in accordance with the settlement agreements. Hawkinson, on behalf of defendant, was put in charge of answering the inquiry. There was a meeting with Internal Eevenue representatives in September, 1954. Defendant knew the purpose of the inquiry. Apparently silence was believed to be the order of the day. Not all of the above facts were imparted to Internal Eevenue. Like the earlier day Western poker players, they were playing this one “ close to their vests ”. Internal Eevenue was told of the settlement transaction only as reflected on defendant’s books. No mention was made of the opinion letters of January, 1950, which were thereafter removed from their original archive. (According to defendant’s counsel: “ These letters were put in a separate file and forgotten for ten years ”.)
Suspicion resulted. For there was conflict in reporting. What began reasonably enough by the Internal Eevenue Service as a check now evoked question. Were there sinister motives to defraud? If so, by whom? Plaintiffs’ knowledge of a fraud investigation came only in January, 1955. The following month, defendant was asked by the Government for a full factual statement. It gave what it wanted, deemed by it to “ be sufficient for [the Government’s] purpose ”. In March, 1955, defendant was again asked for information, this time for sworn answers — an affidavit. There was a conference with Internal Eevenue. After initial discussion and letters among those persons of defendant having the burden of compliance, the affidavit of March 23, 1955 was executed by Hawkinson and transmitted to Internal Eevenue.
*865 A cursory reading of that affidavit reveals a near essence of innocuity — almost amounting to naive innocence; with more careful study, a damning with faint praise.
Defendant had a position to uphold. It was vulnerable. It knew it. It had to make Internal Revenue believe the stand it had taken tax-wise was allowable. At the same time, it could not knowingly implicate its “ arm’s length ” co-contractors without having to indemnify them against any harm which might ensue. Legerdemain was in order. That affidavit was the result. Such phrases as, after the first settlement proposals were turned down “the second came from Mr. S. E. Magid * * * a method of settlement involving stock purchase was proposed ,:s * 0 using the method suggested by Magid which with subsequent modifications was ultimately the settlement arrived at * * * They made the proposals with stock purchases involved * * * we ultimately followed their procedure * * ° taxes were not a major factor in evolving the final settlement arrived at insofar as I or anyone else in the A-Cs organization was concerned ’ ’— all seem quite respectable. But upon whom was this burden of giving the true picture thrust? Was the defendant coerced? Was the defendant, a multimillion dollar corporation, such a babe-in-the-woods, through its “ Vice President in Charge of Finance ’ ’ that it had to bow to the will of this comparatively small corporation (“ a small steel company ”) which, only a few months before was in “quest for working capital from Allis-Chalmers ”? It hardly behooved it further to include in said affidavit the peroration: “ However, all negotiations were strictly at arm’s length
Where then, if indeed Hawkins on “kept memoranda of [their] negotiations,” as he swore in that affidavit, is a reference to the two settlement agreements? The position of the individual plaintiffs in the settlement? The correctness of the Penn-Ohio tax stand knowing that the latter was suspect? Defendant’s own position was made clear in that affidavit: “ At no time did A-C conspire, or intend to conspire, to help Penn-Ohio evade the payment of their correct corporate income taxes.” But what about the cloud over the latter? Could not what ensued have been avoided by forthrightness then and there, with only economic detriment as predicted by its supervisor of its tax accounting department, to which originally its vice-president and comptroller agreed? Could not defendant have dissuaded Internal Revenue from the logical result of the parried replies to the thrust of the questions that the settlement agreements were a ‘ ‘ cover-up ’ ’ for a $200,000 payment to Penn-Ohio? How otherwise could Internal Revenue have evalu *866 ated those answers ? How otherwise conld the conclusion he reached that these Penn-Ohio moneys went into the pants pockets of the individual plaintiffs ’ trousers ? Riposted, fully truthful replies should have been the answers, instead. Partial truth is as ineffective, under such circumstances, as affirmative lies. For it knew that others would be affected by its now argued purpose “ to save itself more than $1,500,000 ” by the settlement. Must the devil, even in defendant’s mind, thus take the hindmost?
The Federal Government acted. It pressed its belief in plaintiffs ’ fraud, based upon the information already given by defendant. Hawkins on went before the Grand Jury on April 24, 1956. He was examined thereafter on December 11, 1956 by the Intelligence Division of Internal Revenue, where he went with tax counsel, a member of the law firm which was defendant’s general counsel. Between those two dates, Hawkins on made another affidavit. It was on May 15,1956 — four days after the six-year Statute of Limitations had run against defendant’s 1949 Federal return (U. S. Code, tit. 26, § 3748 [Internal Revenue Code of 1939]). No harm was apparent, now, in receding from his original position. Some excerpts from it, in contrast, punctilliously support plaintiffs’ position: “Mr. Magid argued that, based on these assurances, he made commitments with his associates, Messrs. Baker and Montgomery, for the purchase of part of their Common Stock at a very large price. At one stage during the negotiations, I believe, he showed me these commitments.” Damages of $270,000 was agreed upon, he continued. ‘ ‘ With agreement reached in this part of the transaction, discussion then was had regarding the sale by Mr. Magid and his associates of a portion of their Common Stock in Penn Ohio * * the agreement originally made for the purchase of a portion of the Common Stock was in recognition of the rights asserted by Mr. Magid in behalf of the Common stockholders. The substitution of the Tungsten stock represented, in my opinion, no material change in the nature of the settlement. * * * In fact, the $270,000 paid out by Penn Ohio as damages to Allis-Chalmers was less than the amount actually owed by it, so that Penn Ohio was entitled to receive nothing at all from Allis-Chalmers. As to this there could be no doubt in the mind of any of the parties ’ ’.
But who would believe him now? Such stultification (the affidavit of March 23,1955) became clear from this almost abject retraction of the position he had taken before. However, the Government thought that the earlier testimony would be repeated by Hawkins on on the trial of any indictment which *867 might emanate from his first affidavit and its reiterated contents before the Grand Jury.
Indictment followed. It was returned on March 8, 1957. It involved each of the individual plaintiffs.
Defendant abjures responsibility therefor. It claims that it was solely “ the theory of Internal Revenue * * * that the individuals had no valid claims against Allis-Chalmers which would entitle them to be paid in settlement of such claims ” because there was 61 nothing in Allis-Chalmers’ accounting treatment of settlement which would have lead Internal Revenue to take any of those positions. In reality, Internal Revenue manufactured these positions without help or encouragement from Allis-Chalmers.” How droll! If during the check of Penn-Ohio’s 1949 return defendant had frankly revealed to Internal Revenue the truth — the closest to which Hawkinson came in his affidavit of May 15, 1956 — 'that theory would have had indited evidence in substantiation. Even now defendant backs away from the facts of that second Hawkinson affidavit. It decries the plaintiffs ’ contention that defendant‘ ‘ should have treated the payment * * * as [one] for the purchase of stock ”. Defendant claims “ it never was. In fact, as we have said, it was a payment made to settle the supply contract and all associated claims, effectuated through the purchase of stock ’ ’! The late Maury Maverick had a name for such language.
Apparently defendant’s present trial counsel and its general counsel do not see eye to eye. “ The agreement ”, states Hawkinson in that affidavit, ‘ for the purchase of a portion of the Common Stock was in recognition of the rights asserted by Mr. Magid in behalf of the common stockholders ’ ’. General counsel stated that that affidavit was ‘ ‘ prepared [by Hawkinson] with [his] help ’ ’, even though he did ‘ not have any first hand knowledge of * * * final settlement in 1949 ”. According to him, (prior to the trial when he did not describe Hawkinson “as a sort of a Mr. Bumble ”) Hawkinson was no small fry in the defendant corporation, having been with it for 48 years and having ‘ ‘ achieved a position of relative eminence in one of the country’s large corporate enterprises. * * * When the Penn-Ohio matter came up he was delegated full authority to work out a settlement.” It is unlikely that trial counsel are a knowledgeable substitute for those facts, by mere argument, or by afterthought demeaning testimony.
The plaintiffs were indicted in March, 1957. For almost a year these accusations remained. The indictments were dismissed in January, 1958. That was not the end. In April, 1959, *868 civil tax fraud proceedings were started. They were based in the main on the same facts and source of information as the criminal indictment. In September, 1959, deficiencies, fraud penalties and interest in high amount were determined and assessed by Internal Revenue. The written views expressed internally by defendant’s tax accountant, approved by its comptroller and later overruled by Hawkinson were even then not disclosed. Petitions for redetermination of the tax liability were filed by plaintiffs. On compulsory pretrial examination of defendant in this adversary proceeding the letters of opinion of Hackney and Keogh, as overruled by Hawkinson, were disclosed for the first time — over 10 years after they were originally made.
In October, 1960, plaintiffs demanded that the prosecution of the redetermination suit in the United States Tax Court be undertaken by defendant. This “ vouching-in ” demand was rejected by defendant’s counsel on the ground of untimeliness and innocence of any wrongdoing. The trial was held in November, 1962 and in May, 1964, the Tax Court rendered its opinion finding in favor of plaintiffs. Plaintiff Baker, because of lack of funds, could not join in this court review. An assessment and lien of $315,086.15, with interest was levied against him in April, 1963, before the successful conclusion of the case as to the other individual plaintiffs.
Except for proof of damage, this was the factual proof of liability at the trial’s conclusion. Several questions of admissibility of evidence were reserved. They, too, will be disposed of in this decision as they appear from the discussion.
I.
That there is a cause of action spelled out in the complaint is no longer open to cavil. It is the law set down by the Appellate Division. I am bound by it; and no amount of argument by defendant can destroy it. Its attempt to minimize the value of Justice Frank’s opinion (7 A D 2d 441, 443, 444) or to limit the ambit of its broad scope is without avail. For to adopt that kind of backward, barren premise (although the court must admit it is borne of good advocacy) is to reverse the time machine — to take this current legal world, with its required remedial justice in the age of atomic and space-thinking, farther back even than the horse-drawn shay days. The world has advanced rapidly — more so in late years. And the large enterprises, such as defendant corporation, which have been in the forefront of these advances, cannot go back to thinking more slowly than their accomplishments for personal advantage. They *869 go hand in hand. And the men who represent them legally must know the altered attitudes of courts toward novel problems as they arise, now more and more frequently from world complexities, both economic and social. Courts will brook nothing but fairness. The evil of caste is no longer here. Now the “ little fellow ’ ’ can obtain equal justice — as he believes it in his own mind.
Advances in legal concept follow from a changing approach to social values — the mores of the people. These advances have been exemplified in various ways. Judge Cardozo once thought little of “ the morals of the market place ” (Meinhard v. Salmon, 249 N. Y. 458, 464). But never being static, he was able, quite without effort fortunately, to proceed space for the balance of his judicial life to prove that the law could at every turn attune itself appropriately to the socio-economic needs of the people as they currently changed. And while ‘ Little profit will come from a dissection of the precedents ” (Meinhard, supra, p. 466), it may not be amiss to inquire into trends in the past which dictated a more liberal view of former legal rigidity.
Of course, there are some branches of law which call for certainty and order, for justice that is strict and ofttimes mechanical— inheritance and succession and conveyance, and the like. But flexible standards are ever so much more desirable— and eminently more required — in matters involving the conduct of humans, where rigid mechanical rules must bend to the varied needs of human lives and freedoms.
As Judge Cardozo said in his Tale lecture series, “ The Growth of the Law ’ ’, specifically in ‘ The Functions and Ends of the Law ”: “ The apportionment of relative value of certainty on one side and justice on the other, of adherence to logic and advancement of utility, involves an appraisement of social interest which each is capable of promoting. That is a calculus which has not yet been definitively made by any master of juristic theory.” (p. 83). And, further, stated that jurist, quoting from Justice Stone’s writing when the latter was Dean at Columbia: “ the choice of the particular device determining the result — social utility — the mores of the times, objectively determined, may properly turn the scale in favor of the one against the other. ’ If classification were ever to become complete for any time and place, there is little chance that it would be final. The good of one generation is not always the good of a successor. * * * In the present state of our knowledge, the estimate of comparative value of one social interest and another, when they come, two or more of them, into collision, will be shaped for the judge, as it is for the legislator, in accordance *870 with an act of judgment in which many elements cooperate, It will be shaped by his experience of life; his understanding of prevailing canons of justice and morality; his study of the social sciences; at times, in the end, by his intuitions, his guesses, even his ignorance or prejudice. ’ ’ (pp. 84-86). All of this, naturally, must be circumscribed by the restrictions which are placed upon him by his oath of impartiality in the application of the law. He cannot pervert it because he disagrees with it. He cannot be knowingly so subjective in appraisal of values as to destroy his efforts to mold and shape it within the ambit of general desires and goals. He must accustom his own ideas to the thought and will of the community.
Bigidity in the application of legal principles, as an end in itself, is intolerable in a changing world. The closed eyes of the figure of justice should not be mistaken for blindness — the inability to see what is happening around her. Instead, the blindfold should symbolically evince an inner sight — to change the balance of her scales as community problems demand that different weight be given to newly arising questions.
This concept is of ancient vintage. For instance, in early English common law the writ was the measure of man’s civil relief. At first only in contract; then came conversion and trover. Our law school days are recalled by such delightfully sounding Latin phrases as de bonis asportatis, quare clausum fregit, vi et armis. But by these changes the writs became available for relief for assault, battery, false imprisonment, removing chattels, wrongful entry, disturbances of domestic relations. However, the futility of the writs was made manifest when, if a plaintiff’s grievance was based upon some tort other than those permitted by the writs, such as libel, slander or negligence, the Chancery Clerks would issue no writ.
At that point in its expansion, the law showed its elasticity and pliability. In 1285 the Statute of Westminister (13 Edw. I, c. 24; I Eng. Stat. 95) was enacted to remedy these legal shortcomings. “ Trespass on the case” was the all-inclusive writ which emanated from the loosened bonds of rigid adherence to form and label. Now, the writ was fashioned to the facts of the case. It was a positive step toward emancipation from form over substance. In 1873 the English Judicature Act wholly abolished forms of action in England (7 Holdsworth, History of English Law, p. 23). Even earlier in this country form gave way to substance (vide 1848, Code of Procedure, § 62). From all this evolved our modern tort law and complete freedom from the slavish confinement to title, form and label.
*871 Modern jurisprudence finds room for development in civil tort law. So long as new facts or unusual situations arise, new approaches to novel rights and duties must govern judicial decision. At no time must the flowing waters of new relief for invaded rights be stayed or muddied by throwing rocks of unreal conflicts into the stream’s bed. Progress should not cease because of arguments long since worn out. A label should never bind actual legal evaluation of facts by the courts. Perfunctory treatment of, or hazy reasoning about, problems of the nature before this court —though they be clouded by diverting argument— should never impel decision which demean community ends (vide 30 Albany L. Rev. 371; Morrison, v. National Broadcasting Co., 24 A D 2d 284).
As recently as March of this year, the Appellate Division once again adopted this view (Squire Records v. Vanguard Recording Soc., 25 A D 2d 190). Regardless of label which may be put upon improper action, if damaging acts come from motives of profit, self-interest or business advantages, there is an action, such as this for “ injurious falsehood, or an action for damage resulting from intentional falsehood.” (p. 192) the court citing Judge Frank’s statement in this very litigation (7 A D 2d 441, 443, 444).
That is the case here. And it was amply proved. No more succinctly can it be said than plaintiffs’ counsel stated in his posttrial brief: “What defendant did in 1949 and 1950 in order to reap for itself an unwarranted tax benefit was wrong, in and of itself. Worse than that, it set the stage for the false and misleading information which defendant later gave Internal Revenue to justify its action which, in turn, triggered the avalanche of disaster which was to overwhelm the plaintiffs.”
II.
A truthful response to the original governmental innocent request for information could have set the inquiry at rest. Hawkinson apparently was otherwise motivated. He could have stated, just as is now stipulated, that these “good-faith bargaining” agreements coming from “extensive arm’s-length negotiations ” were to be regarded in no way “ for tax purposes or otherwise * * * except as reflected by the contracts ’ ’ themselves. He knew that they had been prepared by his own company’s counsel. He knew what they were for and what they were to accomplish. But he led the Internal Revenue Department in another direction. His company was free of any participation in any possible adverse tax implication, he gave them to understand. But, although he knew that the agreements *872 spoke for themselves from arm’s length bargaining, he did not say that the same thing pertained to the plaintiffs — and he kept from them what he told the Government. Nor did they learn for 10 years that the original tax opinion, had it not been distorted and overruled by defendant’s high official, would have exonerated everyone from suspicion of any kind.
There was no subtle purpose in these people’s minds — the defendant, its officers, fiscal and legal advisors — and in what they did. It is quite obvious. And whether one can question the intended subjective goal is not now directly before the court. But the dichotomy evolves at the point where the purpose — • right or wrong — adversely affects others in major aspects. The broad swipes taken by defendant at these plaintiffs in their capacities as taxpayers, was an attempt to obtain an advantage for their company, to plaintiffs’ detriment, not warranted by the actual facts or compatible with the relationships among them over the period of their doing business with each other. The answer to the defendant’s question: “ Is a malicious intent to be imputed to Allis Chalmers on Mr. Brady’s speculation despite the consistent testimony of responsible and respectable attorneys and businessmen that the opposite intent existed? ” is to paraphrase another court (Blaustein v. Pan Amer. Petroleum & Transp. Co., 174 Misc. 601, 662, mod. in other respects 263 App. Div. 97 and 293 N. Y. 281): Relationships such as these men bore to their corporation are realities motivating their business conduct which loom up clearly to any one intent on looking through the fog of corporate artificalities.
It was neither omission nor error. The court believes it was purposeful and with consummate desire to cause the results which actually befell the plaintiffs. Whatever the motivation— fear for themselves as leading lights in their company or for their company only or desire to retaliate for their poor business judgment previously made, vis-a-vis these transactions — the acts committed by them were not mere unintentional violations of plaintiffs ’ rights. They did what they did with aforethought. They were well versed enough to know what the effect of their acts would be. They had no reason to try to obtain absolution for themselves at the expense of inculpating plaintiffs in an act of which they were on the clear record innocent.
Prostituting truth cannot receive askant consideration. Only the innocent remain unsullied in fact.
Courts cannot by surface treatment of heart-bred acts ameliorate the gravity of civil offenses nor assuage with psychological leniency the delinquency of adult people. The latter cannot avoid the usual results of retaliatory and compensatory pro *873 visions created in the law by men whose sole desire is to allow persons to live their own lives in tranquility, undisturbed by efforts of others to harm. And these harm-doing efforts may be inferred from the nature of the acts done.
The proof before the court is instinct with the purpose on defendant’s part to use a particular means to effect a definite result — all of which adds up to intent. And that intent here was wrongful. But even if it were ‘ ‘ not necessary that the intent in tort law be hostile (Prosser, Torts [3d ed.], p. 31; cf. Restatement, Torts 2d, § 13, comment c) ”, an exploration of the common-law reach provides “ a remedy for foreseeable harms resulting from intentional conduct ” (Morrison v. National Broadcasting Co., 24 A D 2d 284, 289).
As to this, apposite language is thus explanatory: “ The elements of this intentional tort are an intentional act by defendant, without justification, which in the normal course of events would cause harm and does cause harm to plaintiff.” (30 Albany L. Rev., pp. 372-373.) (See Aikens v. Wisconsin, 195 U. S. 194, 206; Mogul S. S. Co. v. McGregor, Gow & Co., 23 Q. B. D. 598, 613 [1889], affd. [1892] A. C. 25.) That source further states; ‘ ‘ Whether the act was justified is determined by balancing the public’s interest in freedom of individual action against plaintiff’s interest in security of his body and property ” (ibid., p. 373; Brandt v. Winchell, 3 N Y 2d 628, 634-635; cf. Seavey, Principles of Tort, 56 Harv. L. Rev. 72, 73).
The court would indeed stultify itself if it adopted the superficiality of the argument proffered by defendant that “ from the beginning * * * this case is nothing more than one of semantics ” or a “ semantic exercise indulged in by plaintiffs’ counsel”. No one decries advocacy. Defendant has had it in no small measure here. And of excellent character and legal value as well. It therefore is saddening to the court to remark that pooh-poohing a claim of the gravity of this cause is no substitute for it. One cannot by the wave of the hand, like a prestidigitator, make the claim disappear, as if by magics, or, as defendant claims, by semantics. Defendant has no reason to make light of it that way.
It is more than distressing to conclude that just that kind of approach dictated the appearance of only the single witness in defense. And, at that, one who did not have first-hand knowledge of the genesis of the parties’ relationship who had brought himself up to date when the tax inquiry was made by reviewing company files, Hawkinson’s voluminous memoranda, and by having hearsay discussions with others. Was it constraint or the impelling cause for not subjecting any other knowledgeable *874 associate of defendant to a cross-examination that it would be difficult to maintain such a poised position of nonchalance on a pedestal labelled “ semantics ”, especially if the statue’s figure once bore the legend “ achieved a position of relative eminence in one of the country’s large corporate enterprises ” which was erased on the trial by the overlay substitution of the single, concise “ Mr. Bumble ”. Such distress merchandise cannot be purchased by this court.
Nor, for that matter, can the claim be accepted that “the Government distorted and misinterpreted the facts ”. What facts? And from whom did it get these facts? Was it not simple enough for defendant, when faced with the original inquiry about plaintiffs’ returns (thus indicating whose position was being audited), to have said that plaintiffs’ contention was correct? For even now defendant admits a possibility of its own description (settlement of the steel supply contract) or plaintiffs’ (purchase and sale of stock) being adopted. “ Both descriptions are correct, depending upon how broadly or narrowly one focuses his vision on the transactions which are being described.” It is just too unlucky for plaintiffs, the defendant in effect says, that the Government went wrong in choosing the description adverse to plaintiffs. The crocodile tears thus shed by defendant are all the more made ludicrous by the words: ‘ Allis-Chalmers ’ intent was not to injure plaintiffs or * * * to protect itself, but to give every legitimate aid to plaintiffs in their difficulty with the government.” This the court fails to see. The contention is clear enough. But where are the facts to support it? The facts point the other way. From the recklessness of an act or omission there may be spelled out an intent and purpose to refrain from doing something that a person should have done. It is not necessarily an active participation in the default; it is rather a reckless and intentional passivity, when in fact affirmative preventive action should have been taken; a reckless indifference to the interest of others; an intentional failure to perform a manifest duty in disregard of the consequences which affected the lives and property of others. These are all present here. It was too late for the second Hawkins on affidavit — after the vulnerability to suit was no longer there ■— to do any good.
m.
Except for the two points of evidence now to be discussed, all other motions, applications, objections, and the like, on which decision has been reserved, are denied.
*875 A.
Defendant seriously advances the proposition that when Hawkinson testified before the Grand Jury, although he might have lied maliciously, ‘ ‘ no civil action will lie ” for that perjury; the sole remedy is criminal prosecution by the State. It cites as “ the leading New York case ” one decided by a lower court 158 years ago (Smith v. Lewis, 3 Johns. 157 [1808]) and states that ‘ the rule has remained unchanged to the present day ’ ’, being a rule of convenience because it would otherwise “be productive of endless litigation”. For that reason the plaintiffs, it claims, are divested “ of standing to pursue any civil remedy in respect thereof ”.
There are two facets to this proposition. First, the question of privilege relating to an affidavit in the Government’s tax investigation. Hawkinson gave an affidavit to the Internal Revenue Department on December 18, 1956. Defendant asserts that the privilege attached thereto was absolute because it “ obviously became a preliminary and essential step in the lawsuit which did in fact ensue ”; that it gave “ immunity from responsibility without regard to the individual’s purpose or motive, or the reasonableness of his conduct”. It means, according to defendant, that if a person commits a libel or slander or falsifies deliberately in a “judicial proceeding ” (liberally construed), by which a person is irreparably damaged, the “ absolutely privileged” person may walk away scot-free. It is doubtful. Assuming the power of Internal Revenue to compel witnesses to appear under penalty of contempt, would giving false testimony enhance an immunity which it would have had by honest response? Wanton and reckless disregard for others’ rights is ill will in its pristine sense. At best it is a qualified privilege that defendant had; and by its volunteering prejudicial, incorrect and misleading information, that privilege no longer attached (see Andrews v. Gardiner, 224 N. Y. 440, 446-447; Pecue v. West, 233 N. Y. 316, 321, 322-323).
Second, the evidence Hawkinson gave before the Grand Jury. It was a compulsory appearance. Plaintiffs assert the falsity of his testimony with its consequent damage. Defendant claims that both privilege and secrecy attaches to it. The Grand Jury before which Hawkinson appeared returned an indictment against the plaintiffs for income tax evasion. It was later dismissed. A District Court Judge signed an order giving plaintiffs a copy of Hawkinson’s testimony, which plaintiffs sought to use on this trial. Defendant presses the point that secrecy prevents such use, since the court’s order *876 did not specifically permit its use in this action. But was not the aura of secrecy lost immediately upon legally-permitted disclosure?
The transcript was in fact liberated from secrecy by disclosure, despite the manner thereof or the ultimate limited use argued by defendant. (Cf. a myriad of cases where confidential relationships, such as lawyer and client, were destroyed by eavesdropping or other improper presence of third parties.) It could hardly be re-established as immune from use except in its original milieu. Its character lost virginal exclusivity forever, tarnished by court-ordered publicity. Defendant is forthright to admit that where a particularized need exists for minutes the need to disclose might outweigh the policy of secrecy (Pittsburgh Plate Glass Co. v. United States, 360 U. S. 395, 400). Which leads logically to the conclusion that if someone testifies purposefully to harm the one affected by the grand jury proceedings, that fact would outweigh “ the policy of secrecy ”.
The Dworetzky v. Monticello Smoked Fish Co. (256 App. Div. 772) case does not run counter this view. For there the court sets out that it is a discretionary permissible act. The granting of an order for the inspection of the Grand Jury minutes, however, is left entirely to the conscience and sound discretion of the court; and in that case it felt that the “secrecy of grand jury proceedings and public interest will be best served by denial of application ” (p. 773). Moreover it would have been a little more palatable, too, had the defendant not tried to slide from under responsibility for that Grand Jury appearance and testimony by the icy argument that' the testimony of Hawkins on was his own individual act and not that of defendant because of the kind of subpoena that was issued or because of the respondent superior doctrine. Besides, it is an inconsistent position. If Hawkins on alone is to be held responsible for his Grand Jury testimony, then only he can claim (although improperly under these facts) the privilege and secrecy. For it is a nondelegable personal right. But he is no defendant. He was not even a personal witness at the trial to claim the right, if any.
These points will not be belabored. Suffice it that the affidavit and the testimony are both admissible. However, the court does not rely on either as conelusory testimony for its determination here reached. There is sufficient in this record without that affidavit and without the Grand Jury testimony to justify the court’s decision. And therefore it is not entirely affected by them.
*877 B.
There is a point made by plaintiffs to allow the introduction of mala fides of defendant by showing convictions for antitrust violations — a claimed state of mind which has persisted and which governed defendant’s action in this controversy. The court thinks little of it. It sustains objection to it by defendant. It has dissuaded its mind from any effect it might have in influencing its decision herein.
It is understandable that in the ordinary case where a party subjects himself to inquiry on the witness stand, his truthfulness, his veracity, his trustworthiness for honest statements under oath are all subject to scrutiny by cross-examination. The one defense witness here, however, was a mere witness and not a party; nor did he represent the defendant in a corporate capacity. The effort to prove the present claimed improper motives of defendant by its guilty acts dehors this litigation cannot be countenanced by the method pursued. Such proof may not be given tangentially. It is impotent in its attempted influence on the court.
IV.
The final question is one of damages in a case like this. Were this problem not now in its development through the courts, the task would be simple. Defendant claims it is just that anyway. In fact, one of its briefs ends with a callous belief that “ The entire damage claim in this action is ridiculous ”! And then that theme is beaten to death in its other briefs by statements as “ there can be no general damages and plaintiffs may recover only special damages. * * * This is not a case where damages are presumed, either from the nature of the alleged wrongdoing or from the nature of the injury ’ ’. Morrison v. National Broadcasting Co. (24 A D 2d 284, supra) says otherwise. Justice Breitel recognized that “ It has been assumed by most in the discussion of this case that plaintiff has the burden of alleging special damages. * * * But plaintiff’s claim should not depend upon the allegation and proof of special damages” (p. 293; emphasis supplied). In like manner, these plaintiffs, by criminal indictments against them, followed by the evil-thought-of tax “dodgers” suit in which fraud and evasion was the essence — and so publicly proclaimed, were like Morrison, “ exposed to the charge of being a cheat * * * Put another way; defendants never said to plaintiff that he was a cheater, they only caused him to appear to be one. It hardly requires additional proof that this is destruction of plaintiff’s standing ”.
*878 The court distinguished that case, into which category falls this one, from the “ prima facie tort ” kind of case, advanced in argument by defendant. It is different, the court says, because where the conduct is purposively corrupt * * * or utilizes vicious means * * * the law will allow general recovery for foreseeable harm * * * Thus the principles implicit in this case associate, as to damages, with those found in the law of defamation, just as in other respects the applicable principles are found in the law of deceit, in the law of injurious falsehood [this case], and in one respect, in the law of negligence ” (pp. 293-294).
It is a proper approach, it seems, since the most special kind of subjective damages may ensue from the hurt which generally and logically would flow from a tort of the kind encountered in this case. ‘ The justification for allowing general damages is the practical recognition that harm normally occurs from a type of conduct even if specific damages are not provable. * * * A bad reason for requiring allegation and proof of special damages is to discourage ‘ new ’ causes of action. So too, because only ‘ older ’ forms of action allowed recovery for general damages” (p. 294). Present day needs and current relationships transcend these older forms and passe bases for recoverable damages, and evoke exploration for modern, realistic kinds of damages reasonably expected to occur from this kind of improper conduct. (See Ratcliffe v. Evans, [1892], 2 Q. B. 524). As Justice Breitel points out, in Ratcliffe that English court through Bowen, L. J. “ observed that general damages will be allowed wherever in the course of experience the loss is a direct and natural consequence of the wrongdoing. More important, however, is that, in discussing recovery for the noncategory tort of injurious falsehood, the court made it clear that general damages might be allowed ’ ’ (p. 294) and analogized the rule of damages in defamation ‘ ‘ because the harm sustained is like that resulting from defamation”. The court concludes: “Nor should a slavish formalism apply to the rule of damages any more than to the statement of a substantive claim. In either case, a rule should stand or fall because of its reason or lack of it” (p. 295). (See, e.g., Gale v. Ryan, 263 App. Div. 76; Rager v. McCloskey, 305 N. Y. 75.)
From these citations, the court is influenced to accede to present-day leanings in respect to the damages here arising from, and as a reasonable result of, defendant’s acts and to measure them with ‘ ‘ As much certainty and particularity *879 * * * as is reasonable, having regard to the circumstances and to the nature of the acts themselves by which the damage is done. To insist upon less would be to relax old and intelligible principles. To insist upon more would be the vainest pedantry ” (Ratcliffe, supra, p. 533).
A. By stipuation the parties had agreed on November 8, 1965 that the fair and reasonable fees for the attorneys for plaintiffs in connection with the income tax investigation, the indictment and the civil tax proceedings would be a total of $125,000. By further stipulation during the trial the fair and reasonable fees of accountants and personal expenses were fixed at $65,000. In all, a total of $190,000. These fees and expenses are found to be proximately due to defendant’s acts and are hereby awarded to plaintiffs. Since there is no allocation in these stipulations as to which of the plaintiffs any part is attributable, the judgment to be entered hereon may provide accordingly, as plaintiffs may be advised;
B. The attempt on plaintiffs’ part to “ vouch in ” the defendant in the civil tax fraud proceedings would have little or no effect upon defendant’s liability “for all loss and damage sustained by them in the proceedings ” if, as it does, the court accepts the consequential damage theory plaintiffs advance as having stemmed, not from the rejection of the vouch-in demand, but from the acts complained of in this action. All but Baker were exonerated in that civil tax fraud action. But the wheels of the detrimental conduct vehicle had already been set in motion. The loss was the result of that. It preceded the vouch-in demand for a considerable period, time-wise. The monetary loss to the other plaintiffs as a direct result of the civil tax suit has been adjusted by stipulation with respect to that civil tax action. Consequently there was no additional damage that can be measured solely from the refusal of defendant to take up the legal cudgels for the plaintiffs in the civil tax suit defense. This point relating to Baker will be treated elsewhere.
C. The demand in this ease encompasses both general compensatory and punitive damages. The former, as an absolute right, according to the progressive thinking of our courts today has already been dealt with. The latter touches upon the retributive side of life and takes on the additional view that if, colloquially, one is hit hard in the pocketbook, he and others might be deterred from again using the same tactics and method to hurt someone else. It is moral culpability involved in a case that constrains a court to assess damages that are *880 exemplary. This court cannot for a moment accept the cavalier approach which dictated defense counsel’s martinet stand: “ The remaining claim of punitive damages need [sic] hardly be dignified by reply since no malice or ill will has been shown, even if such damages "were recoverable in this action in any event, which they are not since this is not a libel action.” Perhaps this is the result of defendant’s general philosophy to forget the whole affair, “ a perfect illustration of the type of litigation which should not be allowed to continue and certainly not to develop as far as this case has ’ ’ and there is little to ‘ ‘ prevent this court from summarily dismissing this suit. ’ ’
Are these people — the plaintiffs — expendable to defendant “ one of the country’s large corporate enterprises,” according to it, in the same manner as its own high officer, who ‘ ‘ achieved a position of relative eminence” and who “was delegated full authority ’ ’ in this matter, for its own aggrandizement, expendable “as a sort of a Mr. Bumble ”? What manner of men are these? Is this what people can do with others’ lives just to save some tax money, contrary to their own experts’ opinion ?
Judge Fuld had words of agreement with results of cognate holdings for punitive damages: “Punitive or exemplary damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future. (See, e.g., Toomey v. Farley, 2 N Y 2d 71, 83; Krug v. Pitass, 162 N. Y. 154, 161; Hamilton v. Third Ave. R. R. Co., 53 N. Y. 25, 28; Oehlhof v. Solomon, 73 App. Div. 329, 333-334.) (Walker v. Sheldon, 10 N Y 2d 401, 404).” He went on to quote from Hamilton (supra, p. 30), that it is not the form of action which would validate an award of punitive damages, but ‘ ‘ moral culpability ”.
So here. That this is not a libel action is immaterial. It is “moral culpability” that counts. And since “the harm sustained is like that resulting from defamation” (Morrison, supra, p. 294), the protestation of defendant is impotent. As recently as June 20, 1966 — only a few days ago — Judge Kaufman, writing for a unanimous Court of Appeals, 2nd Circuit, said that an award of punitive damages considerably higher than the compensatory damages awarded “may be viewed as reflecting the moral sense of the community and its desire to prevent repetition of this wrong committed upon one *881 engaged in the competition of the free market place ” (Diapulse Corp. of America v. Birtcher Corp., 362 F. 2d 736, 744).
D. Specifically, I find that as the result of defendant’s wrongdoing there was compensable damage caused to each of the plaintiffs. That there is difficulty in reaching exactitude of amount is no hindrance to the award. It is simply a matter of degree — the amount. For justice would dictate that if plaintiffs were victimized, if there be doubt as to the precise amount suffered, the risk of such damage uncertainty should fall upon the perpetrator. (See Bigelow v. RKO Radio Pictures, 327 U. S. 251, 264; Duane Jones Co. v. Burke, 306 N. Y. 172,192.)
1. Baker: As the direct consequence of what happened here, plaintiff Baker, being without funds, was unable, according to his counsel now, properly to defend himself, as the other plaintiffs did. There was levied against him a deficiency tax with interest and penalties for the year 1949 in the sum of $315,086.15. That he was in poor financial status at the time is admitted by defendant: “ It obviously made no difference to Baker whether the total liens against him were $300,000 or $500,000. since he had insufficient funds to pay either and it was for that reason that he entered his consent to the 1963 judgment and lien ”. Had the vouch-in demand been taken more seriously by defendant, this amount would have been rescued by a proper defense; for his being indigent did not destroy Baker’s legal rights which were coexistent with the other plaintiffs’. As with the others, this claim of the Government, too, would have been dismissed at the small cost stipulated on November 8, 1965. However, Baker could have protected himself by obtaining other counsel, difficult as that might have been. But no effort was made by him toward that end. He capitulated. His doing so cannot entirely be attributed to defendant. Considering this fact and his diminished earning capacity, his age and past-proved ability, as well as other factors involved, the court awards him the sum of $100,000.
2. Magid: No less directly a financial victim of defendant’s acts is plaintiff Magid. In another way, however. His income, he stated in the witness chair, prior thereto averaged over $60,000 per year (from his own efforts). This average gradually dropped during the affected years to almost half and then a third of that sum. He is of prime age today, with his capability for earning still with him. Opportunities were and still are lost as the result of defendant’s acts. There was direct proof of at least one sale of a business which he was asked, because of his ability, to consummate for another. He frankly *882 advised that he was put in a position of adverse publicity which caused him to lose the deal. His share, since the deal was made with another broker with whom there was a division of $150,000 commission, would have been $75,000. In estimating a fair amount he would have made from his divers activities had these adverse events not occurred, the court awards him the sum of $250,000.
3. Montgomery: This plaintiff, too, was no less damaged financially. He had been a high executive with several corporations over the years prior to the happening of the events hereinabove related, which resulted in disaster. For the 10-year period between 1950 and 1959, his salary and earnings went from a high of over $96,000 (1950) to a low of some $2,500 (1958), declining gradually on a fluctuating scale. He earned only a little more on an average until 1964 (some four or five thousand dollars per year). He is not a well man, now, and of almost retirement age. But there was a definite causal connection between the acts done by defendant and the loss of his earnings since they were done. A reasonable compensatory figure for such loss which can fairly be estimated is $100,000. The court awards him said sum.
4. Penn-Ohio: Whatever damage — and there was considerable — ' suffered by the corporate plaintiff was derivative. Its main officers and directing heads were indicted, with the consequent loss of standing of the corporation in the field in which it did business. On defendant’s own statement there is shown a succession of losses through the years in question after prior successful business years. This resulted in no small measure, commftn.suratelv. It parallels the losses of the individual plaintiffs. There were other factors involved which cannot entirely be attributed to defendant’s acts. But in ascribing only part of them as the end product of defendant’s manufacture, the court does not in any way give solace to defendant. It might have been worse; but any serious doubt is being resolved in defendant’s favor by reason of delimiting legal considerations. For the damages estimated to be caused by defendant the sum of $100,000 is awarded Penn-Ohio.
E. Punitive damages. The acts of defendant are completely engulfed in a sea of moral culpability. From the facts herein discussed, there can be but that one conclusion. There was callousness, wantonness and recklessness in what it did. Complete disregard of plaintiffs’ rights was rampant. The objects of this treatment were impotent victims of power. One was made destitute, one ended up sickly, one became the object of scorn — an outcast in the prime of his life. There was *883 almost complete loss of prestige, community standing and former leadership. The indictment and fraud suit caused loss of friends and companionship, heartaches and agonies. Theirs were the scarlet epithets of liars, cheats, frauds, criminals. They were disgraced both within and without their families. Even now these scars remain; and no amount of plastic surgery in the form of damages can erase them fully. For public memory is long and destructive. News media hardly let anything of a scandalous nature die with age. It is good copy forever, written by the pen of callous men who place tax-saving above life-saving. Personal distress could have been anticipated by defendant from its acts. But here is where callousness roared — it made no difference who, other than defendant, was hurt. The tax had to be saved by hook or by crook. “ If the purpose of punitive damage is to punish and to act as a deterrent, a verdict which is not in such sum as to make itself felt upon an offender defeats that purpose.” (Reynolds v. Pegler, 123 F. Supp. 36, 41, affd. 223 F. 2d 429, cert. den. 350 U. S. 846.) In that case, Judge Weinfeld said that to be effective it must “ smart ”. In a unanimous affirmance, Judge Medina, writing for the court, states that Judge Weinfeld “ applied the proper standards ” (223 F. 2d 429, 434).
In a late case our Court of Appeals in Toomey v. Farley (2 N Y 2d 71) adopted the language used by Judge Weinfeld (123 F. Supp. 36, 38) by saying: “ To these views we subscribe.” (p. 83). It has always been the New York law that substantial exemplary damages could be awarded even though little or no financial injury has been suffered (Toomey v. Farley, supra; Clark v. Variety, Inc., 189 App. Div. 462; Hess v. News Syndicate Co., 267 App. Div. 886, and others).
The acts of defendant call for the severity of lesson discussed above. The facts here warrant the imposition of punitive and exemplary damages against defendant in favor of plaintiffs in the sum of $1,000,000 and the same is hereby awarded. Settle judgment.